UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIANE YVONNE BROWN,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 16-cv-04022-EMC

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; AND REMANDING TO THE COMMISSIONER FOR FURTHER PROCEEDINGS**

Docket Nos. 21, 24

Plaintiff Diane Brown seeks judicial review of the Commissioner's final decision denying her application for supplemental security income under Title XVI of the Social Security Act. She moves for summary judgment or, in the alternative, remand for further administrative proceedings. Defendant, the Acting Commissioner of the Social Security Administration ("SSA"), cross-moves for summary judgment and for affirmation of the Commissioner's final decision. Having considered the parties' briefs and the administrative record, the Court **GRANTS IN PART** and **DENIES IN PART** both motions, and **REMANDS** for further proceedings.

## I. INTRODUCTION AND FACTUAL BACKGROUND

Plaintiff Diane Brown applied for Supplemental Security Income ("SSI") on September 25, 2012, indicating that she became disabled on January 1, 2012. *See* AR 180. The Social Security Administration ("SSA") denied her claim on April 4, 2013, and then denied her request for reconsideration on May 13, 2013. *See* AR 110; 119. At Ms. Brown's request, a hearing before an Administrative Law Judge ("ALJ") was held on October 8, 2014. *See* AR 60. At the hearing,

the ALJ and Ms. Brown's attorney interviewed Ms. Brown and a Vocational Expert ("VE"). *See* AR 59. After the hearing, Ms. Brown submitted additional documents and requested that she be found disabled for a closed period from September 21, 2012 to October 15, 2014. *See* AR 179. The ALJ admitted the additional evidence into the record. The ALJ denied Ms. Brown's claim on January 30, 2015, finding she was not disabled for the closed period under section 1614(a)(3) of the Social Security Act. *See* AR 52. Ms. Brown requested review of the ALJ's decision by the Social Security Appeal Council on March 3, 2015. AR 17. The Appeals Counsel denied her request on May 19, 2016. AR 1. Thus, the ALJ's decision became the Commissioner's final decision subject to review in this case. *Id.*

A.     Ms. Brown's Background

        Ms. Brown was 48-50 years old during the relevant disability period. *See* AR 180. She graduated from high school and attended two years of college, but did not earn an associate's degree. *See* AR 75. In 2011, she was diagnosed with right-sided vestibular schwannoma, which caused hearing loss and facial spasms on the right side of her face. *See* AR 699. Her hearing loss was previously diagnosed as Bell's Palsy. *See* AR 315. After undergoing radiation therapy from March to May 2013, Ms. Brown reported severe pain (trigeminal neuralgia), headaches, nausea, and trouble sleeping. *Id.* She had cranial surgery to remove the tumor on July 14, 2014. *See* AR 919. After surgery, she complained of blurred vision and was diagnosed with minimal palledema in August 2014. *See* AR 897; 1017.

        As the result of a 1998 car accident, Ms. Brown has also experienced chronic knee pain treated with medication and steroid injections. *See* AR 739, 761. X-rays taken in July 2012 revealed fractures and deformities in her right knee. *See* AR 362. In June 2014, she was diagnosed with posttraumatic arthritis; she requested knee replacement surgery. *See* AR 761-62.

        Doctors also diagnosed Ms. Brown with depression and obesity. *See*, *e.g.*, AR 1014; 1047. She has other drug-related conditions that are not at issue here. *See* AR 728, 1014.

B.     Expert Testimony

        1.     Dr. Daniel Katzenberg (Examining Physician)

        Dr. Katzenberg is Board eligible in neurology who conducted a comprehensive

2

neurological consultative examination of Ms. Brown in March 2013.  AR 47.  Dr. Katzenberg reported positive findings of deafness and tinnitus in Ms. Brown's right ear; dizziness and poor balance; a rightward slant when walking; and an inability to hop or balance on her right foot.  *Id.* Dr. Katzenberg otherwise noted no significant abnormalities.  He opined that Ms. Brown "can lift and carry on even surfaces no more than 20 to 25 pounds occasionally and 15-20 pounds frequently; she cannot go up and down ladders or work at unprotected heights; she has no difficulty crouching, stooping, or crawling; she can occasionally go up and down stairs with a handrail and walk on uneven surfaces; she has no limitations on her ability to sit; and she can stand and/or walk for 4 hours out of an 8-hour day."  AR 47.

   2. <u>Dr. Aparna Dixit (Examining Psychologist)</u>

  In March 2013, Dr. Dixit performed a psychological examination of Ms. Brown after Ms. Brown reported an inability to sleep, depression, anxiety, hopelessness, tearfulness, and nervous tension.  *See* AR 47-48.  Dr. Dixit concluded that Ms. Brown "exhibited no sign of delusion or hallucination; [that] she was cooperative and able to establish rapport; her judgment and insight were intact; and she performed well on the bulk of the mental status examination."  AR 48.  Dr. Dixit "opined that [Ms. Brown] has mild-moderate difficulties in following or remembering complex or detailed instructions; maintaining adequate pace or persistence to perform complex tasks; adapting to change in job routine; withstanding the stress of a routine work day; maintaining emotional stability or predictability; and interacting appropriately with the public regularly."  *Id.* She also "opined the claimant has mild difficulties in her abilities to maintain attention or concentration and performing tasks requiring mathematical skills."  *Id.*

   3. <u>Dr. Robert Dodd (Treating Physician)</u>

  Dr. Dodd was Ms. Brown's treating neurologist beginning in February 2014.  AR 721.  In July 2014, he opined that Ms. Brown could not work for three months following a craniotomy that month.  *Id.* In September 2014, he affirmed his opinion about Ms. Brown's limitations, but he stated his belief that Ms. Brown was not precluded from full-time sedentary work, though workplace accommodations might be needed to deal with her hearing loss and blurred vision.  AR 749.  He opined that Ms. Brown would be able to return to sedentary work by October 2014.  *Id.*

4. <u>State Agency Medical and Psychological Consultants</u>

In addition to the examining and treating physicians, State agency medical and psychological consultants reviewed the reports of Dr. Dixit, Dr. Katzenberg, hospital records, and Ms. Brown's reported symptoms in connection with her application for Social Security benefits. *See* AR 405-411.  In the initial March 2013 review, the consultant concluded that Ms. Brown could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of 4 hours, and sit for a total of about 6 hours in an 8-hour work-day.  AR 405.  He also noted limitations on her hearing, balance, inability to hop or squat, and knee pain, AR 406, and that she should avoid concentrated exposure to noise and all exposure to hazards related to machinery or heights.  AR 407.  With respect to psychological limitations, the consultant noted Ms. Brown had "moderately limited" ability to understand and remember detailed instructions, "moderately limited" ability to maintain attention and concentration for extended periods, "moderately limited" ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, had a low average IQ score, and showed difficulty with more detailed and complex tasks.  AR 408.  The consultant also noted that Ms. Brown was "capable of simple [household] chores," "takes public transportation," shops for groceries, and that she was "social at church and with her mother and 27 [year] old daughter."  *Id.* The consultant concluded that Ms. Brown's "maximum sustained work capability" was "SEDENTARY."  AR 410.  A later consultant's evaluation was largely consistent, affirming the earlier findings.  *See* AR 583-598.

C.  <u>Ms. Brown's Daily Activities</u>

In questionnaires and in her testimony, Ms. Brown described a modest set of daily activities she continued to perform despite her claimed disabilities.

In a January 17, 2013 questionnaire (Exhibit 3E), Ms. Brown wrote:

- "I live in my mom's home.  She is elderly [and] we try [and] help each other as best as we can."  AR 209.
- "I fix meals 3 times a day not big meals, like salads, soups.  I get tired but I make myself stay busy."  *Id.*

4

- "I try and walk everyday but it[']s very bad on my knees. And my equ[i]librium be off. I try [and] walk a couple of blocks everyday." *Id.*
- "I can lift light groceries, nothing heavy." AR 210.
- "I can carry groceries from the car into the house." *Id.*
- "I make-up my bed everyday, and I do it in good time. I clean the kitchen in good time. I wash my clothes in good time." *Id.*
- In response to the question, "Do you have difficulty finishing any of your housework or other chores?" she responded, "I tire out really fast now." AR 211.
- "I take 6 narcos, 10 mg everyday for pain." *Id.*

In a June 26, 2013 Function Report (Exhibit 5E), Ms. Brown wrote:

- "[I] [m]ostly do light chores [and] read. 1 or 2 pages at a time. Can't concentrate." AR 225.
- Regarding caring for her mother, she stated: "I help my elderly mom as much as I can, make her coffee, walk her a very short distance." *Id.*
- She wrote that she prepared "salads, sandwiches, [but] my mom cook[s] the big meals." AR 226.
- She noted that sometimes "daughter helps me" prepare the meals. *Id.*
- In response to a question about how long it takes her to prepare meals, she wrote, "It depends on what it is. I eat mostly microwave food, can[']t stand on legs long." AR 226.
- "I don't prepare big meals because I don't remember the ingredients I'm suppose[d] to use." *Id.*
- With respect to household chores, she wrote that "I don't iron, I make my bed [and] wash clothes." *Id.*
- With respect to places she visited on a regular basis, she wrote "I go to Sunday school [and] church every other Sunday." AR 228.
- She wrote, "I really have no social life. I stay at home with my mom, other than church." AR 229.
- She reported that she can only walk 2 blocks before needing to rest. *Id.*

In her medical report (Exhibit 4F), Dr. Dixit included the following summary of Ms. Brown's reported "activities of daily living:"

> The claimant said that she is able to perform most activities of daily living. She said she is unable to drive a car as her driver's license has been suspended. She said that she is able to do simple household chores such as washing dishes, doing the laundry, and preparing simple microwave meals. The claimant said she is able to take public transportation. She said she is able to dress and bathe herself. The claimant said in her leisure time, she watches TV, listen[s] to music, and takes walks.

5

AR 382.

Finally, a February 13, 2014 medical report (Exhibit 18F) states in relevant part, "[Patient] exercises on occasion.  Patient is married but her husband lives in Florida and she occasionally travels between the 2 locations.  She is currently living locally with family."  AR 671.

D.    The ALJ's Application of the Five-Step Process

The Social Security Administration (SSA) uses a five-step sequential process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520.  In steps one through four, the claimant bears the burden of proving his or her disability.  At step five, the burden shifts to the Commissioner to show that there are a "significant number of jobs in the national economy that claimant can do."  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999). The process and the ALJ's findings at each step are described below.

1.    Step 1: Substantial Gainful Activity

At Step 1, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 416.920(b).  If an individual engages in substantial gainful activity, he or she is not disabled.  If they do not engage in substantial gainful activity, the ALJ proceeds to Step 2.

At this step, the ALJ found that Ms. Brown had not engaged in any "substantial gainful activity" since filing her application on September 21, 2012.  *See* AR 41.  Accordingly, he proceeded to Step 2.

2.    Step 2: Severe Medical Impairments

At Step 2, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments which have lasted for at least 12 months.  *See* 20 C.F.R. § 416.920(c).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.  If they do, then the ALJ proceeds to Step 3.

At this step, the ALJ found that Ms. Brown had the following severe impairments: benign right acoustic neuroma or vestibular schwannoma, with hearing loss; right knee osteoarthritis; affective disorder; and two drug-related conditions.  AR 41.  The ALJ did not make a finding that

Ms. Brown's obesity was a severe medical impairment.

### 3.    Step 3: Severity of Medical Impairments

At Step 3, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet or equal the criteria of a listed impairment. *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926. If the claimant's impairment is of a severity to meet or equal one of the listed impairments, then the claimant is disabled. If not, the ALJ proceeds to Step 4. At this step, the ALJ found that Ms. Brown did not have an impairment as severe as those listed in the regulations. *See* AR 42. The ALJ concluded, however, that she had "mild restrictions" in activities of daily living, "mild difficulties" in social functioning, and "moderate difficulties" with regard to concentration, persistence, and pace. *See* AR 42-43. He proceeded to Step 4.

### 4.    Step 4: Determination of Residual Functional Capacity

At Step 4, the ALJ must first determine the claimant's residual functional capacity, or his or her ability to do physical and mental work activities on a sustained basis despite limitations related to his or her impairments. *See* 20 C.F.R. § 416.920(e). Then, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past relevant work. *See* 20 C.F.R. § 416.920(f). If the claimant has the residual functional capacity to perform her past relevant work, then she is not disabled. If the claimant lacks that ability, then the ALJ must proceed to Step 5.

At this step, the ALJ determined that Ms. Brown had an RFC "to perform less than the full range of light work," as she can perform work while sitting and standing but cannot stand or walk for more than four hours in an eight-hour period. *Id.* In making a determination, the ALJ "relied heavily" on reports by examining physicians Dr. Katzenberg and Dr. Dixit, as well as treating physician Dr. Dodd. *See* AR 45-49. However, he did not fully credit Dr. Katzenberg's limitation that Ms. Brown could lift and carry only on "smooth surfaces."

The ALJ also made an adverse credibility determination. He stated that although "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." AR 45. The ALJ did not specifically identify

which particular statements he believed were not credible, but he explained,

> The evidence refutes the severity of the claimant's subjective complaints. In this regard, her description of her activities of daily living is not limited to the extent expected, given her complaints of disabling symptoms and limitations. She described regular activities, including caring for her mother, preparing meals, managing her own personal care, walking daily, performing light housework, using public transportation, reading, playing computer games, attending church, and engaging in occasional exercise [citation]. She was also well enough to travel to Florida for several months in 2014, which would generally entail sitting, standing, or walking for extended periods and interacting with strangers [citation]. It appears that, despite her allegedly disabling condition, she has engaged in a somewhat normal level of everyday activities and interactions. The physical and mental capabilities required to perform many of these tasks and social interactions replicate those necessary for obtaining and maintain employment. These examples, while not entirely illustrative of the claimant's believability, provide an indication of her increased capabilities and are other factors taken into consideration in weighing her credibility.

*See* AR 45.

The ALJ also reviewed the claimant's work history and noted that she held various temporary jobs in 2012 and 2013 after onset of her symptoms. *Id.* The ALJ stated that "[w]hile some of these jobs may not have been performed at substantial gainful activities levels due to their seasonal nature, the claimant's ability to perform work suggests that her impairments did not prevent her from working then and would not prevent her from working now." *Id.* Thus, the ALJ concluded that "given the claimant's focus on temporary or seasonal jobs, her work history suggests that her inability to sustain fulltime work may be unrelated to an alleged disability." *Id.*

On that basis, he concluded that Ms. Brown was capable of "light work" with some additional limitations discussed in more detail below. Having determined Ms. Brown's RFC, the ALJ proceeded to determine whether she could perform any relevant past work as a Receptionist, Billing Collections Clerk, Clerical Worker, or Housekeeper. AR 50. He determined that she could not. *Id.* Accordingly, he proceeded to Step 5.

### 5. Step 5: Ability to Perform Jobs in the National Economy

At Step 5, the ALJ must determine whether the claimant is capable of doing any other work based on her residual functional capacity, age, education, and work experience. *See* 20 C.F.R. § 416.920(g). If so, then the claimant is not disabled. If not, then the claimant is disabled.

8

At this stage, the Social Security Administration has the burden of demonstrating that jobs compatible with the claimant's residual functional capacity exist in significant numbers in the national economy. The ALJ will first consult the Medical-Vocational Guidelines, 20 C.F.R. Part 404, which provide a framework for determining whether a claimant is "disabled" or "not disabled" based on the claimant's residual functional capacity, age, education, and work experience. In consulting the Medical-Vocational Guidelines, another guiding factor is whether a person can perform all or substantially all of the exertional demands at a given level of exertion, or whether the claimant has solely non-exertional limitations. *See* SSR 83-11, 83-12, 83-14, 85-15. If the latter, then the ALJ will enlist the assistance of a Vocational Expert ("VE") to determine whether compatible jobs exist in the national economy.

At Step 5, the ALJ began by consulting the Medical-Vocational Guidelines. He determined that "[i]f the claimant had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21 and Rule 202.14." AR 51. However, the ALJ observed that "[Ms. Brown's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations." *Id.* Thus, he consulted a VE to determine whether, based on Ms. Brown's age, education, work experience, and RFC, including additional limitations incorporated into the hypothetical he presented (quoted below), there were jobs she could perform which exist in significant numbers in the national economy. The ALJ posed a hypothetical to the VE:

> [L]et me ask a couple of hypothetical questions first, and for both I want you to assume a hypothetical individual with the same age, education level, and work experience as our claimant. Assume first a light exertional level, but work can be done from a sitting or standing position, and limit standing and walking to four out of eight hours, with occasional climb ramps stairs, never climb ladder, rope, or scaffold, and occasional balance, stoop, kneel, crouch, and crawl; with no manipulative limits. I want to avoid concentrated – let's say avoid even moderate exposure to loud noise, that is limit the noise level to an office level of noise, and I want to avoid all exposure to hazards such as heights and unprotected heights and dangerous machinery. This hypothetical individual is capable of understanding and remembering, and maintaining concentration, persistence and pace for simple one and two step tasks. There are no limits on social interaction; and this individual is capable of adapting to unskilled stress environments.

9

AR 97.  The VE responded that "[w]hen you limit her standing and sitting – or standing and walking to four hours," "[t]hat puts us into sedentary work."  AR 98.  The VE identified three purportedly compatible jobs:

1.  Parking Lot Attendant/Booth Cashier, DOT 211.462-010, categorized as a light, unskilled (SVP 2) occupation, with 1,200 positions in the California economy and 75,000 such positions in the national economy [**Reasoning Development Level 3];**

2.  Addressing Clerk, DOT 209.587-010, categorized as a sedentary, unskilled (SVP 2) occupation, with 1,300 positions in California and 13,000 positions in the national economy [**Reasoning Development Level 2**]; and

3.  Document Preparer, DOT 249.587-030, categorized as a sedentary, unskilled (SVP 2) occupation, with 4,000 positions in the California economy and 45,000 positions in the national economy [**Reasoning Development Level 3.**]

*See* AR 51 (ALJ Decision at 13); AR 98-100 (VE's testimony).

On cross-examination, Ms. Brown's attorney asked the VE whether a person who "because of pain complaints and nausea, and headaches would have interference with concentration for simple, repetitive tasks, equaling about 12 percent of the work day" would be able to perform their past work of housekeeping or any other jobs.  The VE testified that the answer was no, because about 10 percent off-task "is on the borderline of being okay" but "then as we move towards 15 percent there'd be no work."  AR 100-101.

Based on the VE's testimony, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of 'not disabled' is therefore appropriate under the framework of [the Medical-Vocational Guidelines]."  *See* AR 52.

## II.    DISCUSSION

A.    Legal Standard

District courts "have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing."  42 U.S.C.

§ 405(g). The Commissioner's decision to deny benefits may be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Robbins v. Social Sec. Admin,* 466 F.3d 880, 882 (9th Cir. 2006). "'Substantial evidence'" means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* However, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (citation omitted). If the evidence can support either affirming or overturning the ALJ's decision, the Court must defer to the ALJ. *Id.* This Court may reverse an ALJ's decision if it finds non-harmless error. *See Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1055 (9th Cir. 2006). An ALJ's error is harmless if it is inconsequential to the ultimate non-disability finding. *Id.*

B.    Analysis

In the instant case, Ms. Brown challenges the ALJ's determination that she was not disabled for the closed period from September 21, 2012, to October 15, 2014. She asserts that:

  i. the ALJ erred in assessing what jobs Brown could perform based on his own Residual Function Capacity (RFC) determination;

  ii. the ALJ erred in his RFC categorization when he stated that Brown was capable of performing "light," as opposed to "sedentary," work;

  iii. the ALJ erred in his rejection of certain medical testimony;

  iv. the ALJ erred in failing to consider obesity as a severe medically determinable impairment under SSR 02-1; and,

  v. the ALJ erred in finding Ms. Brown not credible.

Each argument will be addressed in the order of its relevance to the Five Step Sequential Process. Argument (iv) relates to Step 2; arguments (iii) and (v) relate to Step 4; and arguments (i) and (ii) relate to Step 5.

1.    Obesity As a Severe Impairment Under SSR 02-1p (Step 2)

According to SSR 02-1p, the agency:

> will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or

11

> mental ability to do basic work activities… We will also consider the effects of any symptoms (such as pain or fatigue) that could limit functioning.

SSR 02-1p.

The ALJ considered the medical record and determined that "the claimant's medically determinable impairment[] of obesity . . . considered singly and in combination [with other medical impairments], do[es] not cause more than minimal limitation in the claimant's ability to perform basic work activities and, therefore, [is] non-severe." AR 41-42. The ALJ further explained that he "consider[ed] the potential effects of obesity in causing or contributing to co-existing impairments as per Social Security Ruling 02-01p," but "f[ound] there is no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning." AR 42. Nevertheless, because the ALJ concluded that Ms. Brown had a number of other severe impairments, he proceeded to Step 3. AR 41-42.

The Ninth Circuit has recently clarified that "[s]tep two is merely a threshold determination meant to screen out weak claims." *Buck v. Berryhill*, --- F.3d ----, 2017 WL 3862450, at *5 (9th Cir. Sep. 5, 2017). "It is not meant to identify the impairments that should be taken into account when determining the RFC." *Id.* Thus, the RFC "*should* be exactly the same regardless of whether certain impairments are considered 'severe' or not." *Id.* Accordingly, where step two is decided in a claimant's favor, there is no prejudice stemming from the failure to find any impairment to be "severe." *Id.*

Under *Buck*, the ALJ's decision not to identify obesity as a "severe" impairment at step 2 was harmless because he nevertheless proceeded to step 3 on the basis of other impairments and incorporated any related mobility restrictions into Ms. Brown's residual functional capacity. Ms. Brown has not explained how the alleged failure to classify obesity as a severe medical impairment at step 2 affected her residual functional capacity at step 4. Thus, any error in how obesity was labeled at step 2 was harmless. *See Buck,* 2017 WL 3862450, at *5; *see also Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (failure to list condition at step 2 of analysis is harmless where associated limitations are factored into step 4 of analysis). The Court therefore **AFFIRMS** the ALJ's step 2 determination.

2.    ALJ's Deviation from Medical Opinions (Step 4)

The uncontradicted opinion of a treating or examining physician may be rejected only for clear and convincing reasons; the opinion of a treating or examining physician that is controverted by another doctor may be rejected only for specific and legitimate reasons supported by substantial evidence in the record. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995); *see also Trevizo v. Berryhill*, --- F.3d ----, 2017 WL 4053751, at *7 (9th Cir. Sep. 14, 2017).

a.    Treating Physician Dr. Dodd

Dr. Dodd determined that Ms. Brown was unable to work for the three months following her July 15, 2014 craniotomy.  AR 49.  Dr. Dodd also opined that, by October 2014, Ms. Brown would be able to return to full-time sedentary work.  *Id.*  Dr. Dodd does not appear to have offered an opinion regarding Ms. Brown's limitations during the remainder of her claimed disability period (September 21, 2012 to July 2014).

The ALJ did not identify any evidence that was in conflict with Dr. Dodd's opinion about Ms. Brown's ability to work between July 2014 and October 2014, the period immediately following her surgery.  His failure to do so constitutes reversible legal error.  "The medical opinion of a treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Trevizo*, 2017 WL 4053751, at *7. "When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)).  The ALJ does not appear to have engaged in any analysis of whether the Dr. Dodd's opinion was considered "controlling."  However, even if the ALJ had implicitly determined Dr. Dodd's opinion was *not* "controlling" for that period, the ALJ "fail[ed] to apply the appropriate factors in determining the extent to which [Dr. Dodd's] opinion should be credited." *Id.*  The ALJ simply did not engage in any analysis whatsoever of those factors.  Thus, the ALJ did not present clear and convincing reasons not to credit Dr. Dodd's opinion that she could not work after the July 2014 craniotomy.

b.    Examining Physician Dr. Katzenberg

Ms. Brown challenges only the ALJ's decision not to adopt Dr. Katzenberg's opinion that she could lift and carry only on "smooth surfaces." AR 380. The ALJ stated that "the claimant's testimony and recently received medical records" justified disregarding the limitation. AR 48.

This was legal error. "To reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 2017 WL 4053751, at *7 (quotations, citations, and alterations omitted). The did not identify or discuss what the recently received records purportedly contradicting Dr. Katzenberg's opinion were. AR 48. However, even assuming that Dr. Katzenberg's opinion was in fact "contradicted" by other medical records, the ALJ would still have to provide "specific and legitimate reasons" to reject Dr. Katzenberg's opinion.

In *Trevizo*, the ALJ rejected a treating doctor's opinion. The Ninth Circuit held that the ALJ's citation only to the claimant's childcare responsibilities did not constitute a "specific and legitimate reason" to reject the doctor's opinion: "[t]he ALJ did not develop a record regarding the extent to which and the frequency with which [claimant] picked up the children, played with them, bathed them, ran after them or did any other tasks that might undermine her claimed limitations." 2017 WL 4053751, at *8.

In the instant case, the ALJ cited no doctor's findings or other medical evidence to contradict Dr. Katzenberg's "smooth surfaces" limitation. Nor did the ALJ develop a record of specific details that show how going to the grocery store, preparing simple meals, walking two blocks daily, going to church every couple weeks, and possibly visiting her husband out of state undermined Dr. Katzenberg's opinion. The ALJ's departure from Dr. Katzenberg's "smooth surfaces" limitations was not justified by "specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 2017 WL 4053751, at *7.

c.    Prejudice

The ALJ's erroneous decision to discount the medical opinions of Dr. Katzenberg and Dr.

14

United States District Court
For the Northern District of California

Dodd was not harmless. Fully crediting Dr. Dodd's assessment would have resulted in a finding of disability following her craniotomy. Further, fully crediting Dr. Katzenberg's testimony would have resulted in inclusion of the "smooth surfaces" limitation in the residual functional capacity hypothetical presented to the VE. The use of an incomplete hypothetical rendered the VE's opinion without evidentiary value. *See Ghanim v. Colvin*, 763 F.3d 1154, 1166 (9th Cir. 2014) ("[I]f an ALJ's hypothetical is based on a residual functional capacity assessment that does not include some of the claimant's limitations, the vocational expert's testimony has no evidentiary value.") (quotation omitted); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988) ("Hypothetical questions posed to the vocational expert must set out *all* the limitations and restrictions of the particular claimant, including, for example, pain and an inability to lift certain weights.") (emphasis in original). The Court cannot "confidently conclude" that the outcome would have been the same absent this error because the ALJ's determination was based on the VE's testimony, which in turn was based on the incomplete hypothetical. *Cf. Stout*, 454 F.3d at 1056 ("[A] reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ . . . could have reached a different disability determination.").

     3.     ALJ's Credibility Determination (Step 4)

When evaluating whether a claimant's testimony regarding subjective symptoms is credible, an ALJ must follow a two-step analysis. First, the ALJ determines whether the claimant presented objective medical evidence of an impairment which "could reasonably be expected to" cause "some degree of" the declared symptoms. *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996). If so "and there is no evidence of malingering, then the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* The findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v.*

*Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

The ALJ may consider several factors in making a credibility determination, including: "(1) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (2) whether the claimant takes medication or undergoes other treatment for the symptoms; (3) whether the claimant fails to follow, without adequate explanation, a prescribed course of treatment; and (4) whether the alleged symptoms are consistent with the medical evidence." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1040 (9th Cir. 2007). If supported by substantial evidence, such factors could constitute "specific, clear and convincing reasons." *Id.*

Ms. Brown alleged "debilitating symptoms" that "limit[] her abilities to squat, bend, walk, kneel, hear, climb stairs, see, remember things, complete tasks, concentrate, understand things, follow instructions, use her hands, and get along with others." AR 44-45. She also claimed she could "pay attention for only one minute, lift 5 to 10 pounds, walk two blocks, stand for 10 minutes, and sit for 5 to 10 minutes before her knees start hurting [citation]." *Id.* The ALJ found "[a]fter careful consideration of the evidence . . . the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 45. The language of the finding suggests that the ALJ did not simply view the objective medical evidence as compatible with "some degree of" the symptoms, *Smolen*, 80 F.3d at 1281, but apparently compatible with the "alleged symptoms" as a whole. Nevertheless, at the second step, the ALJ concluded that Ms. Brown's testimony about her limitations was "not entirely credible" because of her daily living activities and her recent work history involving seasonal, temporary jobs. AR 45. In these circumstances, the ALJ must "offer[] specific, clear and convincing reasons" for rejecting Ms. Brown's testimony. *Smolen*, 80 F.3d at 1281.

a.  Everyday Activities and Interactions

Daily activities are a basis for discrediting a claimant's testimony if they occupy a substantial part of her time, are incompatible with her claimed functionality limitations, and are evidence of transferable work skills. *Lingenfelter*, 504 F.3d at 1040 (daily activities must be "inconsistent with alleged symptoms"); *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989) (everyday activities must show "a claimant is able to spend a substantial part of his day engaged in

16

pursuits involving the performance of physical functions that *are* transferable to a work setting" to support adverse credibility determination) (emphasis in original).  The evidence cited by the ALJ (described above in Section I.C) does not meet this standard.  The daily activities included going to the grocery store, preparing simple meals like soups and salads for herself and occasionally her mother, walking two blocks a day, and going to church on a weekly or biweekly basis.  The ALJ merely stated in a cursory manner that "[t]he physical and mental capabilities required to perform many of these tasks and social interactions replicate those necessary for obtaining and maintaining employment," but did not explain how.  AR 45.  The ALJ failed to explain how Ms. Brown's ability to perform this modest, infrequent, and limited set of activities established her ability to maintain regular attendance at work.  *See Popa v. Berryhill*, --- F.3d ---, 2017 WL 3567827, at *4 (9th Cir. Aug. 18, 2017) (reversing where "the ALJ provided no explanation as to why [petitioner's] ability to attend church weekly in the past, shop for groceries, and watch television, establish that [she] possesses the ability to maintain regular attendance at work").

Further, the ALJ did not explain why these relatively modest, simple tasks like microwaving meals, preparing salads and soups, carrying light groceries from her car to her house (at an unspecified distance), and walking up to two blocks, "provide an indication of her increased capabilities," beyond those which Ms. Brown claimed.  AR 45.  *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (credibility determination insufficiently specific where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony" (emphasis in original)).  The records do not suggest these activities are incompatible with Ms. Brown's claim that she could pay attention for only one minute, lift no more than 10 pounds, walk only 2 blocks at a time, or stand for 10 minutes before her knees began to hurt.  AR 44-45.  There was no basis to conclude that preparing salads, soups, or microwaving meals required her to exceed that limitation; the same is true about walking two blocks per day or going to church once every two weeks.  Though Ms. Brown stated she carried her groceries from her car to her house, the record does not indicate how much those groceries weighed; the ALJ thus had no reason to believe they weighed more than 10 pounds, let alone that she lifted them frequently.  Finally, Ms. Brown's reference to "exercise" does not establish that she was running marathons or weight-

17

lifting rather than walking "two blocks" as she claimed.

Moreover, the ALJ did not explore these issues at the October 8, 2014 hearing. If he thought these statements might have been probative of Ms. Brown's credibility, he could have sought more information about them from her. Rather, he simply asked Ms. Brown whether she cared for her mother, to which Ms. Brown responded that she helped her with "little things" because her mother was "very independent." AR 90. The "little things" included "sometimes I like to fix her a breakfast," or "load the washer, fold the clothes, you know; nothing strenuous. I do nothing strenuous." *Id.* These simple tasks do not raise doubts about the extent of her limitations. The ALJ did not probe into whether she could do more.

Ms. Brown's purported travel to Florida is also not substantial evidence supporting the ALJ's determination. His conclusion was based solely on two thin references to Florida visits in the medical records. Further, the mere fact that Ms. Brown may have traveled to Florida to visit her husband "occasionally" does not suggest that her limitations were not as severe as reported by her treating and examining physicians, by the State agency consultants, and by Ms. Brown herself. The ALJ stated a trip to Florida would "generally entail sitting, standing, or walking for extended periods and interacting with strangers," AR 46, but this was an assumption without any elicited facts. There was no basis in the record to conclude that Ms. Brown's trips to Florida involved activities incompatible with Ms. Brown's claimed limitations. The ALJ citation to an October 31, 2014 medical report which stated Ms. Brown "is [g]oing to Florida for a few months," AR 1023, was also misplaced. The record does not establish whether Ms. Brown actually went to Florida for a few months following the October 31, 2014 report, but even if it did, it would be irrelevant because the trip would have occurred *after* the claimed disability period, October 15, 2014. *Cf. Lingenfelter*, 504 F.3d at 1039 (failed work attempt that took place after the disability period did not support rejecting subjective testimony about how symptoms precluded work during disability period).

In sum, a claimant's everyday activities may not be the basis for an adverse determination unless "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that *are* transferable to a work setting." *Bowen,* 885 F.2d at

603 (emphasis in original). That is because "many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id.* Under *Bowen*, Ms. Brown's ability to perform modest home activities did not automatically mean she could perform similar tasks in the workplace environment. 885 F.2d at 603. Nor did it mean that Ms. Brown spent "a substantial part of [her] day engaged in [these] pursuits." *Id.*; *see also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (reversing credibility determination even where claimant could "go grocery shopping with assistance, walk approximately an hour in the malls, get together with her friends, play cards, swim, watch television" and "exercise[] at home" because "these physical activities did not consume a *substantial part* of [her] day").

The activities cited here do not contradict the asserted limitations – they are simply indicia of an attempt to lead a normal life within the boundary of those limitations. "Several courts . . . have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Time and again, the Ninth Circuit has affirmed that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Bowen*, 885 F.2d at 603. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Brown*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)).

The ALJ's determination that Ms. Brown's everyday activities and visits to her husband contradict her claimed limitations is not supported by substantial evidence and did not constitute "specific, clear and convincing reasons" to discredit her testimony.

b. <u>Work History</u>

In analyzing Ms. Brown's credibility, the ALJ also analyzed Ms. Brown's recent work history. According to her Work History Report, Ms. Brown held five temporary jobs between 2010 and 2012, but only one fell during the closed period of disability: a six-week position as a Bell Ringer for the Salvation Army. *See* AR 212. The ALJ surmised "the claimant's ability to perform work suggests that her impairments did not prevent her from working then and would not

19

1    prevent her from working now," and also that "given the claimant's focus on temporary or

2    seasonal jobs, her work history suggests that her inability to sustain fulltime work may be

3    unrelated to an alleged disability."  AR 45.

4        This conclusion was erroneous.  Ms. Brown does not claim an onset of disabling

5    symptoms until September 21, 2012.  Reliance on her ability to work prior to that time as evidence

6    that "her impairments did not prevent her from working" is error.  *See Lingenfelter*, 504 F.3d at

7    1039 (post-disability work attempt irrelevant to whether symptoms precluded work during the

8    disability).  That Ms. Brown worked as a Bell Ringer for Salvation Army for two months during

9    her disability period is, in and of itself, not substantial evidence of her ability to perform work.

10   According to her work history report, this job involved walking for 2 hours a day, standing for 1

11   hour a day, sitting for 6 hours a day, and lifting no more than 10 pounds at a time.  AR 216.  That

12   is not inconsistent with the functional limitations she claimed or those stated by her doctors.

13       Although the work itself is not incompatible with Ms. Brown's limitations, it is

14   conceivable that a claimant's sporadic work history may constitute a reason to doubt whether her

15   claimed inability to work related to a disability at all, as the ALJ suggested.  *See, e.g.*, *Thomas v.*

16   *Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (negative credibility determination was supported by

17   claimant's "extremely poor work history"); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir.

18   2001) ("A lack of work history may indicate a lack of motivation rather than a lack of ability.").

19   However, the record does not support that conclusion here.  In *Thomas*, the claimant not only

20   showed "little propensity to work in her lifetime," but the ALJ also found "no objective medical

21   evidence to support [her] descriptions of her pain and limitations."  278 F.3d at 959.

22       In contrast, here, the ALJ concluded that objective medical evidence *did* explain "the

23   alleged symptoms."  AR 45.  The limitations found by treating and examining physicians limited

24   Ms. Brown's ability to work and the opportunity to find employment.  While Ms. Brown

25   discussed a series of temporary jobs she had worked over the course of fifteen years at the hearing,

26   *see* AR 67-75, the ALJ made no attempt to ask Ms. Brown why these tended to be seasonal or

27   temporary jobs, or what Ms. Brown's reasons were for leaving each position before the disability

28   period.  Indeed, the ALJ made no attempt to determine Ms. Brown's reason for leaving the

Salvation Army job.  This is unlike those cases where the credibility of a claimant's subjective testimony was undermined because the record indicated that specific factors other than disability caused the claimant to leave his or her job.  *See*, *e.g.*, *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (work history undermined credibility where claimant stated he left job because he was laid off, did not seek medical attention until nine months after lay-off, and did not seek treatment despite complaints of severe pain).  Moreover, Ms. Brown's departure from the Salvation Army job was not inconsistent with the fact that "she began experiencing intermittent symptoms beginning in late 2013" of "headaches and facial spasms" caused by her trigeminal neuralgia, as confirmed by a December 2013 MRI that determined her vestibular schwannoma was "the underlying cause of her trigeminal neuralgia, as the tumor impacted her right trigeminal nerve." AR 42.  This ultimately resulted in a need for cranial surgery a few months later.  AR 42.

On this record, Ms. Brown's work history was not a sufficient basis to find that she was not credible.

### c.  Prejudice

The ALJ's error was not harmless.  On the basis of his adverse credibility determination, the ALJ disregarded Ms. Brown's subjective pain complaints and her "statements concerning the intensity, persistence, and limiting effects of [her] symptoms." AR 44-45.  The hypothetical posed to the VE thus did not include any mention of Ms. Brown's subjective pain complaints.  AR 97.  The VE's testimony on the basis of an incomplete hypothetical therefore lacked evidentiary value and could not be substantial evidence supporting the ALJ's determination.  *See Ghanim*, 763 F.3d at 1166 (VE testimony "has no evidentiary value" when based on incomplete RFC); *Embrey v. Bowen*, 849 F.2d at 422 (hypothetical posed to VE "must set out *all* the limitations and restrictions of the particular claimant, including, for example, pain . . . .") (emphasis in original).  Moreover, here, when asked by Ms. Brown's counsel to consider the identical hypothetical but to include that the individual's pain complaints interfered with 12 percent of their work day, the VE testified that no work would be available to such an individual.  AR 100-101.

### 4.  "Light Work" Versus "Sedentary" Work (Step 5)

At Step 5 of the sequential evaluation, the ALJ consults the Medical-Vocational Guidelines

("the grids") to determine if jobs exist in significant numbers in the national economy that the claimant can perform. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 200.00. The Medical-Vocational Guidelines are, essentially, a table of rules that determine whether a person is "disabled" (jobs do not exist) or "not disabled" (jobs do exist) based on the claimant's exertional abilities, and the claimant's RFC, age, education, and work experience. *See Hoopai v. Astrue*, 499 F.3d 1071 at 1075 (9th Cir. 2007). If an individual can perform the full exertional requirements of a particular classification (i.e., the full requirements of a "light work" or "sedentary" position), then the ALJ must follow the corresponding rule in the grids. If, however, an individual cannot meet the full requirements of a particular classification, or if a claimant has both exertional and significant non-exertional limitations, then the ALJ merely uses the grids as a framework and consults a Vocational Expert for assistance. *See* SSR 83-14.

Here, the ALJ determined that Ms. Brown was capable of "light work." According to the grids, a person with Ms. Brown's RFC, age, education, and work experience who was capable of the full range of "light work" would be "not disabled." *See* Vocational Rules 202.21 and 202.14. However, a person with Ms. Brown's RFC, age, education, and work experience who was capable only of "sedentary" work could be "disabled" depending on whether the claimant has transferable job skills. *See* Vocational Rule 201.14; *see also* 20 C.F.R. § 404.1568(d)(1) (skills are "transferable" "when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled activities of other jobs or kinds of work"). Because the ALJ determined that Ms. Brown was capable of "light work," he did not make a determination regarding the transferability of job skills. AR 50.

Ms. Brown challenges the ALJ's determination that she was capable of "light work" rather than "sedentary" work. She argues that the definition of "light work" exceeds her capabilities because it requires "frequent lifting or carrying," which means "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. However, the ALJ determined Ms. Brown could not stand or walk for more than 4 hours of an 8-hour work day. Although Ms. Brown is correct, it does not necessarily follow that her classification must then have been "sedentary," the next step below "light work." SSR 83-10 defines "sedentary work" as

requiring that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday." Thus, her capabilities with respect to how many hours she could stand or walk per day exceeded the "sedentary" classification. In these circumstances, where the claimant's exertional abilities fell between two grid rules, the ALJ was not obligated to automatically assign the lower category; rather, he was required to consult a VE to determine if jobs existed in the national economy that Ms. Brown could perform, which the record shows he did. *See Moore v. Apfel,* 216 F.3d 864, 869 (9th Cir. 2000); Social Security Ruling ("SSR") 83-12, "Adjudicative Guidance," Rule 2.

Thus, that Ms. Brown could not stand or walk for a total of approximately 6 hours of an 8-hour workday would not, by itself, be a sufficient basis to vacate the ALJ's "light work" determination because that fell between the "sedentary" and "light work" requirements, and the ALJ correctly looked to a VE for assistance. However, as discussed above, the ALJ's "light work" classification was based on a faulty credibility determination, as the ALJ declined to credit Ms. Brown's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms." AR 45. These included her claim that she could stand for about 10 minutes before her knees began to pain her, a standing limitation well below the 2-hour limit for the sedentary range. AR 87. The "light work" classification also contradicted two medical opinions (Dr. Katzenberg's with respect to her lifting and postural restrictions, and Dr. Dodd's with respect to inability to work for three months following surgery and her ability to perform only "sedentary" work thereafter) and the opinions of the State agency consultants describing Ms. Brown's RFC as "sedentary." The ALJ's supposition of the "light work" classification must be vacated because it is not supported by substantial evidence.

The classification error was not harmless. If the ALJ had adopted a "sedentary" classification, the Medical Vocational Guidelines would have directed a finding of "disability," without any need to consult a VE. *See* Vocational Rule 201.14. The only way the ALJ could have reached beyond the Guidelines and referred to a VE would be if he had found that Ms. Brown lacked transferable job skills. But the ALJ never reached that question. The framework of analysis was altered as a result of this classification error.

23

Even assuming referral to the VE was correct, there are additional problems. First, when told to "assume first a light exertional level, but work can be done from a sitting or standing position, and limit standing and walking to four out of eight hours," AR 97, the VE responded that the limitation "puts us into sedentary work." AR 98. Even though the VE then identified jobs that were sedentary (Addressing Clerk and Document Preparer), those jobs exceeded the ALJ's RFC assessment with respect to Ms. Brown's reasoning skills. Second, the VE acknowledged that there would likely be no work available for a person whose pain interferes with more than 10% of their workday. AR 100-101. Here, as noted above, the ALJ had no sufficient basis to discredit Ms. Brown's testimony that indicated her condition would significantly interfere with her workday.

Accordingly, the Court cannot "confidently conclude" that a different outcome would not have resulted absent the error. *Stout*, 454 F.3d at 1056.

### 5. Conflict Between ALJ's RFC and VE's Jobs Testimony (Step 5)

Finally, Ms. Brown argues that the ALJ erred because he failed to resolve a conflict between the RFC he posed to the VE, and the jobs the VE identified in response. The Court agrees.

At Step 5 of the Sequential Evaluation, the Commissioner has the burden of proving that the claimant is not disabled because specific jobs exist in significant numbers in the national economy which the claimant can perform based on her identified limitations. 20 C.F.R. § 404.1560(c)(2). The ALJ may satisfy this requirement by asking a vocational expert a hypothetical question about jobs that a person with all of the claimant's limitations, as supported by evidence in the record, could perform. *Hill v. Astrue,* 698 F.3d 1153, 1161 (9th Cir. 2012). The ALJ is responsible for recognizing and resolving any apparent conflict between the VE's testimony about available jobs and the claimant's ability to perform the job requirements. *Rounds v. Soc. Sec. Admin.,* 807 F.3d 996, 1003 (9th Cir. 2015).[1] In other words, if the VE identifies a job

---

[1] Ninth Circuit case law does not support Defendant's contention that Ms. Brown waived her right to appeal this issue because counsel did not raise it during administrative proceedings. *Meanel v. Apfel,* 172 F.3d 1111, 1115 (9th Cir. 1999) held that claimants who are represented by counsel "must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." However, in that case, the claimant attempted to introduce new evidence that had not been presented at the administrative hearing. Here, in contrast, Ms. Brown does not attempt to

that is not actually compatible with the ALJ's hypothetical RFC, then the ALJ must address the discrepancy by citing to specific evidence explaining and resolving the inconsistencies. If the ALJ fails to do so, but still relies on the VE's testimony in the ultimate disability determination, the ALJ commits prejudicial error. *See*, *e.g.*, *id.* at 1004 (remanding because, where ALJ did not recognize the conflict and VE did not address whether it could be resolved, the court "cannot determine whether substantial evidence supports the ALJ's step-five finding"); *Zavalin v. Colvin*, 778 F.3d 842, 848 (9th Cir. 2015) (holding that "the ALJ's failure to reconcile the apparent conflict [between the VE's testimony and the DOT] is not harmless").

Here, the ALJ instructed the VE to think of a job that could be performed by a "hypothetical individual [who] is capable of understanding and remembering, and maintaining concentration, persistence and pace for simple one and two step tasks." AR 97. The language used in this hypothetical, specifically referring to "simple one and two step tasks," corresponds with General Educational Development ("GED") Reasoning Development Level 1 as defined in the Dictionary of Occupational Titles ("DOT"):

> Level 1: Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
>
> Level 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
>
> Level 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DOT (4th Ed., Rev. 1991), Appendix C, *available at*

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

introduce new evidence, but rather, address legal error in the ALJ's decision based on the record before him. As Ms. Brown notes, finding a waiver here would make no sense, as she could not have objected at the hearing to a decision that was not made until after the hearing. Further, the Ninth Circuit cases are clear that it is the ALJ's duty to resolve the conflict at that stage of proceedings. *Zavalin*, 778 F.3d at 846 ("[T]he ALJ is required to reconcile the inconsistency" when there is a conflict between the VE's testimony and the DOT); *Rounds*, 807 F.3d at 1003.

1    Yet, when the VE responded, he identified three jobs (Parking Lot Attendant/Booth

2    Cashier, Addressing Clerk, and Document Preparer), all of which correspond to a higher

3    Reasoning Developmental Level of 2 or 3. *See* AR 51. The ALJ neither identified nor reconciled

4    the apparent inconsistency. *See* AR 98-100.

5         The Commissioner contends that this discrepancy was not outcome determinative because

6    other information in the record – *e.g.*, that Ms. Brown could handle her own funds and take care of

7    herself, her home, and her mother – supports a finding that she could perform some complex or

8    detailed work. To the extent this could be read as an implicit finding by the ALJ that Ms. Brown

9    could perform Level 2 or 3 reasoning, *see* Cross-Motion at 10, any such finding would be based

10   on mere speculation. The ALJ did not explicitly undertake any such analysis at the hearing or

11   render any such finding in the written decision. The court is "constrained to review the reasons

12   the ALJ asserts" and "cannot affirm the decision of an agency on a ground that the agency did not

13   invoke in making its decision." *Zavalin*, 778 F.3d at 848 (citation and quotation omitted). Here,

14   as in *Rounds*, the ALJ relied on an RFC limiting the claimant to "one- and two-step tasks," but

15   then in accepting the VE's testimony concluded that the claimant could perform certain jobs that

16   actually required the higher Level Two reasoning, without identifying or explaining the

17   discrepancy. *See Rounds*, 807 F.3d at 1003. Accordingly, under *Rounds* and *Zavalin*, the ALJ

18   erred by failing to recognize and reconcile the apparent conflict. This means the Court "cannot

19   determine whether substantial evidence supports the ALJ's five-step finding." *Id.* (quotation and

20   citation omitted). Accordingly, here, as in *Rounds*, "[o]n remand, the ALJ must determine

21   whether there is a reasonable explanation to justify relying on the VE's testimony." *Id.*

22                        ### III.   **CONCLUSION**

23        The ALJ did not err in determining that obesity was not a severe medically determinable

24   impairment. The ALJ's rejection of examining and treating physician testimony was not

25   supported by specific and legitimate reasons because Ms. Brown's daily activities did not

26   contradict the doctors' opinions. Moreover, the ALJ's adverse credibility finding was not

27   supported by substantial evidence for the same reason: the modest, limited daily activities she

28   engaged in did not establish that her abilities exceeded those she claimed or that she could

otherwise maintain regular work attendance. The ALJ's conclusion that Ms. Brown's exertional classification was "light work" rather than "sedentary" was tainted by the faulty credibility determination, and was not otherwise supported by substantial evidence. Further, the ALJ's determination that jobs existed in the national economy that Ms. Brown could perform was not supported by substantial evidence because the ALJ failed to reconcile a conflict between the VE's testimony and Ms. Brown's RFC with respect to reasoning abilities. Because the ALJ committed error which was not harmless, the Court **REMANDS** to the Commissioner for further proceedings consistent with this opinion.

Thus, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** the Commissioner's cross-motion for summary judgment.

This order disposes of Docket Nos. 21 and 24.

**IT IS SO ORDERED**.

Dated: September 29, 2017

_____
EDWARD M. CHEN
United States District Judge